We now move to the next case on the argument calendar, Estate of William Han Manstrom-Greening v. Lane County. And my understanding is Mr. Moore, is it? Yes, your honor. And you're participating by video and can you hear us okay? I can. I apologize. We had a case got extended into this week and that's the only reason I'm not physically attending and I apologize. No problem. Thank you, counsel. And counsel, for the appellant, whenever you're ready. Good morning and may it please the court. My name is Elizabeth Savage. I represent plaintiff, the Estate of Manstrom-Greening, and I'd like to reserve five minutes for rebuttal. The district court erred in excluding Dr. Lipson's testimony. That testimony was essential to establish the risk of harm created by defendant's actions. Here, as in all Oregon negligence cases, the jury is tasked with determining whether the defendant's unreasonably created foreseeable risk of harm to people in the position of the decedent. So, counsel, you agree. I think your brief says this. Every issue you have on appeal, the standard of review is abuse of discretion, correct? That's correct, your honor. Okay, go ahead. It is an abuse of discretion standard. However, I would say that relevance is a low bar. And this court has repeatedly stated that the exclusion of an expert should be based on a gatekeeping function and not a fact-finding one. Well, I mean, there are two ways, or there's probably more than two ways, but there are at least two ways to keep out expert testimony. I mean, one is a Dauberk round, but another is 702, whether it will help the trier to understand the evidence or to determine a fact in issue. So it's not just are the methods reliable under Dauberk. I mean, some people refer to it as beyond the can of the lay people on the jury. And, your honor, in this case, the evidence was excluded on relevance grounds. It's our position that that is the basis of the error. Here we have common misconceptions. Although I'm looking at ER 35, which is the transcript here, and the court said if I'm reading it correctly, having an expert opine on what the plaintiff describes in their briefing as the risk factors, causes, and prevention of suicide does not aid the jury in their fact-finding mission in this case. So I think you could read that statement also as talking about is this going to aid the jury, not just relevance, right? Well, I think the question of relevance is, in fact, will this aid the jury in determining a fact at issue? And that doesn't require that the testimony speak to every element of the claim, only that some essential part of the claim is made more or less probable. In this case, the expert's testimony would have established the risk of harm created by the defendant's actions. And because the defendants relied heavily on common misconceptions about suicidal ideology, about the weapons effect, about the risk of harm created by unsafe storage practices, the plaintiff should have been entitled to counterbalance those arguments with testimony intended to rebut those common misconceptions. Just if you could focus for a moment on the proposed testimony by Dr. Lipson on the weapons effect, can you just describe how that, you know, fits into your theory of the case here? Yes, thank you, Your Honor. The weapons effect is the very well-documented phenomenon that viewing a weapon on a repeated basis triggers violence thoughts and impulses. In this case, the firearm in question was left in plain view on a daily basis in a common area in which the officer himself was not present. The weapons effect provides support for plaintiff's theory in the case in that there was an increased risk of harm to household members, in this case the decedent, by simply viewing that weapon on a daily basis. The other basis of the testimony, the main basis, was the idea of impulsivity, that suicide is not, in fact, as many people believe, an inevitable course of action when somebody has some suicidal thoughts. In fact, suicide itself is an impulsive act, even if there was ideation present before, and that any delay of that impulse is an effective means of decreasing the risk of harm. So, for example, putting a firearm in a safe, leaving a firearm unloaded, leaving it in a place that is more difficult to access, all of those methods are an effective way of decreasing the risk of suicide in the home. Even in a case where the boy who tragically killed himself had the combination to the safe? Well, Your Honor, in the first place, under current Oregon law, which was not in place at the time, giving an unauthorized user a combination to a safe would be negligent per se. Okay, but we're dealing with the law as it was in place. Understood, Your Honor. Yes, even if the minor, sorry, even if the child, the 18-year-old, had had access to the safe, the amount of delay in simply accessing that weapon would give cause for thought. Now, the district court said that, you know, something that takes more time takes more thought. But this really is a psychological principle. But, again, the question is under, for that particular finding by the district court, the question, putting aside harmless error, is whether, under Rule 702, the district court abused its discretion in making a determination under 702A that this would help the trier of fact understand, as opposed to being within the ken of the lay people on the jury. A lay person on the jury cannot be presumed to have firearms training, firearms certification, nor, in particular, as in the case with Lane County, be responsible for implementing training, certification, and even safety rules. Any firearms training or certification to understand that a trigger lock could slow things down, could, you know, sort of stop the flow of impulsivity? I guess I'm kind of struggling to understand that point. I think the issue with the district court's reasoning here was that your average juror would have the same knowledge and experience and, therefore, have the same view of whether or not this was foreseeable as a law enforcement agency or a law enforcement officer. And given the knowledge and experience that I think we could reasonably impute to those defendants, I don't think that's a reasonable assumption. Under Oregon negligence law, we don't look at foreseeability from a generalized reasonable person standard. We look at foreseeability based on the shoes of the defendant, what they knew at the time. You know, respectfully, counsel, I mean, reading the quote from the district court that you started, leaving out the part about Stephen Hawking, everybody knows that things that take more time take more thought. And why under Rule 702A is that determination here an abuse of discretion? Because I think, Your Honor, it's an oversimplification of a psychological phenomenon having to do with impulsivity and access to weapons. In this case, we're talking about access to a weapon that can immediately facilitate an instantaneous and irrevocable death. That's what makes firearm safety so much more important. If a person were to swallow a bottle of pills or to slit their wrists, there is time in those processes to rethink the decision, or even once those acts have occurred, to call 911. The studies show that most people that have attempted to commit suicide do not do so a second time. But with a firearm, that access, that ability to act immediately upon impulse, that is the true danger. Because without a second to pause and have second thoughts, there is simply no opportunity for the victim to have a change of heart. I'm going to ask the question I was going to ask earlier. One of the things that I found a little bit challenging, we have this foreseeability, and I think you were going to say it's not just some reasonable person, but it's the reasonable person in the shoes of the, in this case, the county or the father. But several times in your comments, and I think in your briefing, you talked about the reason you wanted to bring in this expert was to address common misperceptions. I think I wrote that down as something. Is there any tension between the idea that you need to have an expert come in and correct common misperceptions for the jury? But if the expert, to some extent, to the extent the expert was successful in doing that, you're basically telling the jury something that's not a common understanding, right? If it's a common misperception, it's not a common understanding. If you were able to convince them of this weapons effect theory, but if that's not something that people commonly know or believe, how does that help the jury in figuring out whether this was foreseeable by the father in this case? Because, as your Honor anticipates, my answer is that what is foreseeable by a law enforcement officer, and in particular, a county who, as an employer, has a duty to promulgate rules and policies about the use of its employees' firearms, for those defendants, what is foreseeable is very different. And again, under Oregon case law, that's very well established. For example, a crop duster who is experienced should be able to foresee that crop dusting next to a fox farm might have a detrimental effect on those animals, right? That's not something that a lay person would necessarily know, but Oregon case law says we look at the defendant at issue here on their knowledge and experience. The knowledge and experience of the county was I think I understand. Is your position that the county would understand this weapons effect or that they should have understood this weapons effect? I think they I think they did, and if they didn't, they should have, because they certainly had rules about how firearms were to be stored in the office. A firearm was to be on an officer's person. I know that, but there's many reasons for having firearms safely stored that are unrelated to the fact that your co-worker might walk by and possibly kill themselves. That's true, but the scope of the risk of harm created by unsecured firearms is what we're looking at, not the specific sequence of events. And the county understood that there was a foreseeable risk of harm inherent in leaving unsecured firearms where unauthorized users could access them, which is why it had a rule about guns being in safes while at the workplace or on the officer's person. So it is foreseeable that its employees, most of whom took their duty weapons home, would also be in a position to have their firearms in a readily accessible place where unauthorized users, children, grandchildren, visitors, intruders, might encounter them. Counsel, you're down to about two minutes. Do you want to reserve the remainder of your time? I do, Your Honor. Thank you. You're welcome. Alright, so I think we're going to hear Mr. Moore first from you. Yes, Your Honor. Alright, whenever you're ready, Mr. Moore. Thank you, Your Honors. And again, I apologize for not being present personally. I always enjoy that experience. May it please the Court, I'm Bruce Moore representing the defendant, Father Glenn Greening. The issues the Court needs to focus on is whether or not the district court judge abused his discretion in making these rulings at trial, whether or not he excluded evidence that was relevant, and if there was error given the facts that were presented to this jury, was any error harmless? To me, the themes of the case that I want to raise that sort of tie in with sort of an explanation of the facts are shock. This case was about shock. This was completely unperceivable. The evidence was overwhelming that this was a child that had not been in trouble at school, was doing extremely well at school, was involved in sports, was looking forward to college, had a great relationship with his father. His father trusted him. It was just one of those kids that never, ever did anything wrong and was blossoming. His friends were shocked. His teachers were shocked. He was not withdrawn. The improvement while he was in his father's home was clearly established before the jury, as well as the trust that had occurred between father and son. The only two... So, Counsel, is your argument that whether the district court abused its discretion turns on whether it was foreseeable that this young man was going to tragically take his life? That's one of the issues that he had to decide in determining what was relevant. The other theme is the facts in this case indicate there was no impulse decision. If you look at the overall facts, this was Will Manstrom's decision to take his own life and it was not on an insult or an impulse. The evidence was he was peeling down, looking at his notes and what not, that he was suffering from the effects of a failed relationship with a girl that he did not disclose to anybody, not even the friends that he had. He actually wrote notes that indicated, look, I didn't tell you about how I was feeling on this because I knew you would try to stop me. And the note to the father was especially telling... There were notes that were left on the computer and then he was handwriting some notes as he was sitting in the garage before he committed the act. He was waiting until the clock struck midnight to turn it into Valentine's Day, the day that he would be committing suicide. The note that he left on the computer to his father, I think it was exhibit A, basically says, don't blame yourself, there's nothing you could do. He was stating this was his decision. The counsel saying that somehow the expert testimony about means matter or the weapons effect just isn't applicable in this case given the facts and circumstances. The child went to bed, his father came in and said goodnight to him. The father did his normal setup where he got the gun out of the safe and set it out outside the room that he was sleeping in. The child waited for his dad to fall asleep and then comes out and gets the gun. He sits in the garage before he commits suicide writing one last note to the name. But it obviously was not anywhere near an impulse. It was not an impulsive act. It was not an impulse decision. The evidence is absolutely clear. The father had gone over gun safety with the son. He knew the son had had gun safety training already. They had talked about never touching the gun, never using the gun, and the son had access to the gun in the safe where the father would store it. This was a locked house, a probation officer at home who felt that it was reasonable to have the gun in a position to where it could be used for home defense and was very aware of the responsible nature of his son, the nature of his ability to trust his son, and the reasonableness of the trust that he placed into with his son. I'm going to talk just a little bit on the fourth assignment of error, which is the conscience of the community. I know it wasn't raised in the argument already, but I tried to cite to the court the great latitude that was given to the plaintiff estate in this case to talk about bringing to bear their thoughts as a community. I pointed out that they were able to talk about your sons and daughters protecting from another life being taken. There was all kinds of argument that was allowed in that allowed the estate to make the full case that it wanted to make. If there's no further questions, I'm going to, if I can, leave the remainder of my time to the counsel for the other defendant. Okay. Thank you. Thank you. Good morning, your honors, and may it please the court. My name is Erin Pettigrew, and I represent Lane County, Lane County Parole and Probation, and Mr. Donovan Dumeier. This jury was instructed to consider whether co-defendants created a reasonably foreseeable and unreasonable risk of harm to Mr. Manstrom Greening in his ultimately tragic decision to do what a reasonably careful person would do under similar circumstances. And because all of the excluded evidence sought to be introduced would not assist the jury in answering these common law claims of liability or any defenses therein, they were appropriately excluded. I'll turn first to the question of Dr. Lipson's expert testimony. In that particular, so there's two positions that the plaintiff appellant has taken. First, they have argued that the testimony would be admissible to address risk factors, causes, and prevention of suicides. And the court appropriately concluded, and I quote, how an expert understands psychology in suicide is not relevant. And indeed, how an expert assesses, a psychiatrist assesses risk factors is not relevant to how Lane County Parole and Probation, Lane County or a probation officer should assess those factors. And nevertheless, Your Honors, there was ample testimony on the record regarding the elements of notice that one might be concerned about, right? The facts regarding Mr. Manstrom Greening's life, any of the information, the facts that were relied upon in Mr. Lipson's testimony, proposed testimony, were adequately explored and presented before the jury. And therefore, there would be no prejudice to the jury in assessing the information that would be available to the defendants. Now on reply, plaintiff appellant argues that the expert testimony would have been useful to the issue of gun storage. And again, Mr. Lipson is not an expert in any of those matters. Gun storage, training of public safety officers, risk management. He is a psychiatrist and he was allowed to provide limited testimony in the area in which he is an expert. Again, the jury also heard information about safe storage of weapons. There was testimony elicited from current managers at Lane County Parole and Probation, as well as colleagues of Mr. Greening. And so again, the jury was not deprived. As I understand it, the dad was safe. Would he have followed it? And he said yes. Am I remembering that right? That is correct, Your Honor. Second, to the question of weapons effect, there was no evidence either described in Mr. Lipson's proposed testimony or elicited at trial that any Lane County employee at any time, including Mr. Greening, had any specific knowledge or training as to this particular theory. And again, we must go back to the standard in which the jury was instructed. Reasonable person, reasonable care. Not the knowledge that can be imputed from experts to common individuals. And so again, and to the Court's point today, this is a common sense notion. Even if it were information that may or may not have been helpful to the jury, it is a common sense notion, as the trial court pointed out, that did not require the aid of an expert. And then finally, there was ample argument and evidence as to the logical implications of how locks or other safety devices can slow the actions of an individual who may want to take their own life or take other violent acts. Next I'll turn to Officer Bremmer's testimony. So the proposed purpose of Officer Bremmer's testimony is for two purposes. One, to describe the death investigation and the statements made by Mr. Greening in the course of that investigation. Two, to identify the location in which Mr. Greening left his gun before going to bed. And three, to testify the location of the gun may put occupants in the residence at greater risk in the event of a break-in. So at no point did Plaintiff Appellant propose that Officer Bremmer's testimony be based on experience or knowledge that should be imputed to a similarly situated parole officer in Lane County. And I want to walk through these first few questions one by one, Your Honors, just to explain a little bit further how this did not harm Plaintiff's case in any way. The first three questions, as to his experience in performing investigations, were not relevant because there was no challenge as to his failure to provide testimony as to the simple facts of the events. He was then asked for statistics that were otherwise unproven and not supported by the evidence regarding a, quote, proliferation of suicides in Lane County. This had been extensively explored in pretrial rulings by the trial court judge and had been ruled to be irrelevant and possibly prejudicial in this case. Lastly, the last challenge question pertains to the training of Officer Bremmer and the correlation between access to firearms and suicide. That question was objected to and sustained. There was no foundation laid... There was also a question asked, have you investigated any prior suicides by firearm? There was an objection, and that objection was sustained. You're correct, Your Honor. And why wouldn't that have been relevant? Your Honor, I would agree that it may have been relevant, but I don't believe that it would result in harmful error to the jury's deliberations. Again, there was no challenge to Officer Bremmer's background or training investigations, either on direct or in cross, and it was his opening direct, Your Honor. So there was truly no below the plaintiff with regard to that question never made an offer of proof. But my understanding is that you have never, you have not in your brief said that that's not cognizable because they didn't make an offer of proof. You've never raised the offer of proof issue, correct? You are correct. That is not raised, Your Honor. However, there was an additional sidebar conducted by the testimony where there was opportunity for plaintiff to describe the reasoning for these questions, and additional support for these questions was not offered by counsel at that time. Finally, as to the last challenge question pertaining to the training of Officer Bremmer, again, there was no foundation laid that his training and background were the same or similar of Mr. Greening or other Lane County employees, and there was frankly no notice to the court that he was going to testify on facts related to the storage of firearms and the proximity of that fact with suicide. It was clear to the observer and plainly clear to the court that this question was not consistent with the stated purposes of his testimony as framed by the defendant, and therefore did not meet the standard of relevance. And lastly, I'd like to briefly address the issue of adjudicative facts versus legislative facts. This is the third assignment of error. As to the first and the third, these were statistics offered by plaintiffs to suicide generally and among young men. There is no argument that these statistics were known or these particular conclusions were known by Mr. Greening or co-defendant, and they don't meet the standard of an adjudicative fact. Generally, those would be their identities, their activities, and their business. These would be generally stated facts as to risk of suicide and prevalence of suicide in the community, but that did not necessarily rise to the level under ER-201. Fourth, as to the final legislative fact, which is how it was teed up by plaintiff appellants as a legislative fact in their motion for judicial notice, those are generally established truths, facts, or they are typically used to interpret statutes or other legislative acts, and they are not appropriate to determine the legal duties and obligations of parties in the particular case. I'd like to read that fourth fact, if I may. It states, a proven barrier to the impulse to commit suicide is securing firearms with a lock or storing firearms with a locked container. Now, it's not clear why this was offered by plaintiff appellant, but assuming arguendo that it is relevant to the standard of reasonable care, that would be one of only several factors and circumstances that the jury could consider in assessing what reasonable care is. And so do you have a final point? Thank you. And I would just say that it would, to make such a special instruction as that one, would be extremely prejudicial and arguably a misrepresentation of law. And with that, I thank you for your time, Your Honors, and ask that you close the hearing. Thank you, Your Honors. I wanted to address the last point first, which is the adjudicative fact that was asked to be admitted. That fact was published by Lane County, as well as in support of the House bill that later became law, that a barrier to suicide is securing firearms. Given that it was published by Lane County, and it wasn't a statistic, it wasn't a nationwide statistic, that it was a fact that was readily verifiable, and one reasonable juror could conclude foreseeable by Lane County, who had published this fact, I think was extremely relevant to the jury's determination. In fact, counsel argued in their answering brief that it was too relevant, and that's why that fact shouldn't have been admitted. But it was not unfairly prejudicial. Going back to our other counsel's arguments about the shock and unforeseeability of the suicide, it's true. We never know what's on somebody's mind, and that's exactly why safe storage practices are so important. The idea that his mind was made up, that this was a decision, this is something heavily relied upon at trial, but in fact, the science doesn't support that. Suicide, the act itself is an impulse. Our expert would have testified that ideation is common, but the act of suicide, he would have rebutted, is really an impulsive act, and if that impulse is delayed, often the suicide will not occur. So I also wanted to make clear that suicide is not an intervening cause so that there can be no negligence. This Court already decided that issue when it reversed the District Court's grant of summary judgment. Even with ideation, there is suicide. The son, in this case, was an unauthorized user. There is no evidence that any safety precautions were taken with respect to that unauthorized user, and as far as home defense is concerned, leaving a loaded firearm in plain view next to the entrance of a house when one sleeps in another room is not a reasonable form of self-defense. You have a final comment, Counsel? Yes, Your Honor. I respectfully request that this Court reverse, and thank you for your time.
judges: BENNETT, VANDYKE, THOMAS